IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

OI EUROPEAN GROUP B.V.,

        Plaintiff,

    v.

BOLIVARIAN REPUBLIC OF VENEZUELA;
PETRÓLEOS DE VENEZUELA, S.A.; PDV
HOLDING, INC.; CITGO HOLDING, INC.;
CITGO PETROLEUM CORPORATION; GLAS
AMERICAS LLC, *in its capacity as collateral
trustee*; MUFG UNION BANK, N.A., *in its
capacity as indenture trustee*; and
ROSNEFT TRADING, S.A., ORLANDO
CHACIN; JESUS LUONGO; ANTON
CASTILLO; EULOGIO DEL PINO; and MARIA
DEL CARMEN MARTINEZ;

        Defendants.

C.A. No. ___-_____

## COMPLAINT

Plaintiff, OI European Group B.V. ("OIEG" or "Plaintiff"), for its Complaint against

Defendants, The Bolivarian Republic of Venezuela ("Venezuela"), Petróleos de Venezuela, S.A.

("PDVSA"), PDV Holding, Inc. ("PDVH"), CITGO Holding, Inc. ("CITGO Holding"), CITGO

Petroleum Corporation ("CITGO Petroleum"), GLAS Americas LLC, in its capacity as collateral

trustee ("GLAS"), MUFG Union Bank, N.A., in its capacity as indenture trustee ("MUFG"),

Rosneft Trading, S.A. ("Rosneft"), Orlando Chacin, Jesus Luongo, Anton Castillo, Eulogio Del

Pino, and Maria Del Carmen Martinez, alleges as follows:

## INTRODUCTION

1.      Venezuela is a state that has long operated outside of the accepted norms of international law.  It is currently subject to wide-ranging international sanctions, including within the United States for, among other things, its "endemic economic mismanagement and public corruption at the expense of the Venezuelan people and their prosperity, and ongoing repression of the political opposition; attempts to undermine democratic order . . . ; and the regime's responsibility for the deepening humanitarian and public health crisis in Venezuela."  Executive Order No. 13835, 83 FR 24001 (2018); *see also* Executive Order No. 13850, 83 FR 55243 (2018).

2.      For more than a decade, Venezuela has acted lawlessly towards foreign investors.  Plaintiff OIEG is among its numerous victims.  In October 2010, Venezuela sent armed guards to forcibly occupy and seize two glass container factories, owned by two different entities.  OIEG was a majority shareholder of each owner entity.  In September 2011, OIEG commenced an arbitration proceeding against Venezuela before the International Centre for Settlement of Investment Disputes ("ICSID"), asserting claims relating to Venezuela's unlawful expropriation of OIEG's investments in the two glass container factories.

3.      After long delays, OIEG received an arbitral award, on which it is currently owed in excess of $500 million.  While resisting OIEG's expropriation claim, and similar claims of other victims of expropriation, Venezuela dominated, controlled, and manipulated its U.S. corporate subsidiaries, moving billions of dollars in assets out of the reach of U.S. and other courts and all non-Venezuelan creditors, including OIEG.

4.      At issue in this suit are U.S. assets held and formerly held by wholly-owned subsidiaries (direct and indirect) of Venezuela.  Although nominally Delaware corporations, these entities are alter egos, and mere instrumentalities of Venezuela itself, such that arbitral award(s)

held by OIEG against the sovereign are enforceable against them.  Venezuela exercises both *de jure* and *de facto* control over these corporations, and has exercised that control to put assets outside the reach of its creditors.

5.     The four affiliated entities dominated and controlled by Venezuela who participated in this Venezuela-orchestrated scheme were Defendants PDVSA, PDVH, CITGO Holding (formerly known as PDV America, Inc.), and CITGO Petroleum (collectively, the "Alter Ego Defendants").  The Alter Ego Defendants are wholly owned, directly or indirectly, and utterly dominated and controlled by Venezuela, through overlapping directorships and senior officers who answer directly to the Venezuelan government.  The Venezuelan government dominates and has approval rights over the day-to-day operations of the Alter Ego Defendants, and at relevant times used its power to abuse the corporate form, seize substantial value related to CITGO Petroleum, and remove it from the United States to Venezuela in order improperly to shield that value from creditors like OIEG.

6.     Plaintiff seeks a declaration that the subsidiary Defendants are alter egos of Venezuela whose juridical independence should be disregarded, such that the actions taken by them should be imputed to Venezuela, their assets should be deemed to be assets of Venezuela, and the liabilities of Venezuela owed to Plaintiff should be deemed enforceable against them.

7.     Plaintiff also seeks to avoid unlawful dividends and stock pledges as fraudulent transfers, and to hold directors of PDVH and CITGO Holding derivatively liable to their respective companies and directly liable, under 8 Del. Code § 174 to OIEG, as having the status of a creditor of those companies, for causing the corporations to pay unlawful dividends.

## PARTIES

8.      Plaintiff OIEG is a private company with limited liability ("*besloten vennootschap met beperkte aansprakelijkheid*") organized under the laws of the Kingdom of the Netherlands. OIEG has its headquarters and principal place of business at Spoorstraat 7, 3112 HD, Schiedam, Netherlands.

9.      Defendant Venezuela is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), at 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), and 1602–1611.

10.     Defendant PDVSA is a foreign corporation wholly owned and controlled by Venezuela and is a putative instrumentality of Venezuela within the meaning of the FSIA. PDVSA's headquarters and principal place of business is in Caracas, Venezuela.  PDVSA operates as a government agency with no independence from Venezuela.  Its day-to-day operations are extensively controlled by Venezuela, its assets are used by Venezuela as if they were Venezuela's assets, its chief executive officer is a Venezuela government minister and a general in the Venezuelan army, and it is required by Venezuelan law to perform and fund significant governmental functions unrelated to its business in the petroleum industry, which functions are often to the detriment of PDVSA's own interests.  This Court has held that, at all times relevant to this action, PDVSA has been an alter ego of Venezuela.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 22 F. Supp. 3d 380, 406 (D. Del. 2018).

11.     Defendant PDVH is a Delaware corporation with its principal place of business at 1293 Eldridge Parkway, Houston, Texas 77077.  PDVH is a wholly-owned subsidiary of PDVSA.

12.     Defendant CITGO Holding is a Delaware corporation with its principal place of business at 1293 Eldridge Parkway, Houston, Texas 77077.  CITGO Holding is a wholly-owned direct subsidiary of PDVH.

13.     Defendant CITGO Petroleum is a Delaware corporation with its principal place of business at 1293 Eldridge Parkway, Houston, Texas 77077.  CITGO Petroleum is a wholly-owned direct subsidiary of CITGO Holding.

14.     Defendant Anton Castillo was at all relevant times a director of PDVH.

15.     Defendant Orlando Chacin was at all relevant times a director of both PDVH and CITGO Holding.

16.     Defendant Jesus Luongo was at all relevant times a director of both PDVH and CITGO Holding.

17.     Defendant Eulogio del Pino was at all relevant times a director, chairman of the board and president of CITGO Holding.

18.     Defendant Maria Del Carmen Martinez was at all relevant times a director of both PDVH and CITGO Holding.

19.     Defendants Chacin, Luongo, Castillo, Pino, and Martinez are referred to collectively in this Complaint as the "Director Defendants."

20.     Defendant GLAS is a New York corporation with its principal place of business in London, UK, which conducts business in the United States.

21.     Defendant MUFG is a California corporation with its principal place of business at 445 South Figueroa Street, 28th Floor, Los Angeles, California 90071.

22.     Defendant Rosneft Trading is a Russian private company with its principal place of business in Geneva, Switzerland, which conducts business in the United States.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this entire action pursuant to 28 U.S.C. § 1330(a) and 28 U.S.C. § 1367, because Venezuela is a "foreign state" as defined under

28 U.S.C. § 1603 and PDVSA is, presumptively, an "agency or instrumentality of a foreign state" as defined under 28 U.S.C. § 1603(b).

24.     This Court has jurisdiction over all other defendants in this Complaint under its diversity jurisdiction pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between OIEG and each other defendant in the action, and the matter in controversy exceeds $75,000.

25.     Pursuant to 28 U.S.C. § 1605(a)(2), Defendants Venezuela and PDVSA are not immune from the jurisdiction of this Court, because this action arises from (i) Venezuela's and PDVSA's commercial activity carried on in the United States; (ii) acts performed by Venezuela and PDVSA in the United States, either directly or through the Alter Ego Defendants, in connection with a commercial activity elsewhere; or (iii) acts performed by Venezuela and PDVSA outside the United States, either directly or through the Alter Ego Defendants, in connection with Venezuela's and PDVSA's activities elsewhere.

26.     Each Alter Ego Defendant is an alter ego of Venezuela and of each other Alter Ego Defendant.  The Alter Ego Defendants' acts may be imputed to Venezuela for purposes of determining subject matter jurisdiction.

27.     Once service has been made on Venezuela and PDVSA in accordance with the provisions of 28 U.S.C. §§1608(a)–(b), the Court will have personal jurisdiction over Venezuela and PDVSA under 28 U.S.C. § 1330(b), because each falls within the exception enumerated at 28 U.S.C. § 1605(a)(2), as alleged specifically herein, and, therefore, each is not immune from suit.

28.     Personal jurisdiction in this District is proper over PDVH, as it is a Delaware corporation.

29.     Personal jurisdiction in this District is proper over CITGO Holding, as it is a Delaware corporation.

30.     Personal jurisdiction in this District is proper over CITGO Petroleum, as it is a Delaware corporation.

31.     Personal jurisdiction is proper over each of the Director Defendants, as each is sued in connection with acts and omissions undertaken as a director of a Delaware corporation.

32.     Personal jurisdiction is proper over each of GLAS, MUFG, and Rosneft Trading, because, on information and belief, each has transacted business within Delaware and otherwise acted so as to give rise to jurisdiction under the provisions of 10 Del. Code § 3104.

33.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (f).

## FACTUAL ALLEGATIONS

**A.     OIEG Is a Creditor of Venezuela**

34.     Headquartered in Perrysburg, Ohio, Owens-Illinois, Inc. engages, through subsidiaries, in the world-wide manufacture of glass containers.  Plaintiff OIEG, which is an indirect, wholly-owned subsidiary of Owens-Illinois, Inc., is the majority shareholder in two Venezuelan companies that owned and operated Venezuela's two largest glass container production plants:  (1) Owens-Illinois de Venezuela, C.A. ("OIdV"), and (2) Fábrica de Vidrios los Andes C.A. ("Favianca").

35.     Each of OIdV and Favianca owned a factory that produced, processed, and distributed glass containers in Venezuela.  Each was a leader in the Venezuelan glass container market.

36.     On or about October 26, 2010, Venezuela forcibly occupied the two factories and issued a decree of expropriation with respect to OIEG's investments in Venezuela, including the two factories.

37.     On or about September 7, 2011, OIEG commenced against Venezuela an arbitration before ICSID on the ground that Venezuela illegally expropriated OIEG's investments in violation of the Bilateral Investment Treaty between the Netherlands and Venezuela.

38.     An ICSID tribunal issued a final arbitration award in favor of OIEG and awarding it damages as follows: (i) US $372,461,982 as compensation for Venezuela's illegal expropriation; (ii) interest thereon, from October 26, 2010, through the date of payment, calculated at the LIBOR interest rate for one-year deposits in US dollars, plus 4% compounded annually; (iii) US $5,750,000 for OIEG's costs and expenses in the ICSID arbitration; and (iv) interest thereon, from March 10, 2015, through the date of payment, calculated at the LIBOR interest rate for one-year deposits in US dollars, plus 4% compounded annually (together, the "Award").

39.     In July of 2015, Venezuela commenced proceedings before ICSID to annul the Award.  Over a course of years, Venezuela repeatedly delayed proceedings with specious arguments, alleging that a member of the tribunal was biased against it, seeking to disqualify the president of the ad hoc committee hearing Venezuela's application for annulment (the "Committee"), and delaying the processing of its own claims by refusing to pay fees.

40.     On or about July 27, 2016, pursuant to 22 U.S.C. § 1650a and Article 54 of the ICSID Convention, OIEG filed a complaint in the United States District Court for the District of Columbia seeking to enforce the Award (no. 1:16-cv-01533-ABJ).  In late 2017, the district court stayed the confirmation proceeding pending the Committee's determination of Venezuela's annulment application.  On December 6, 2018, the Committee issued its *Decision on the*

*Application for Annulment of the Bolivarian Republic of Venezuela*, which unanimously rejected Venezuela's annulment application in its entirety and ruled that Venezuela shall be responsible to pay in full the costs of the Annulment proceeding, including the costs of legal representation and interest thereon.

41.     On December 18, 2018, the District Court lifted the stay.  OIEG's petition for recognition of the Award and entry of judgment thereon is under advisement.

## B.     BILLIONS OF DOLLARS IN ARBITRAL CLAIMS AGAINST VENEZUELA MOUNT AND VENEZUELA STATES INTENTION NOT TO PAY "ANYTHING."

42.     OIEG is one of many foreign investors to have suffered massive losses stemming from Venezuela's unlawful expropriation of assets.

43.     At all relevant times, numerous creditors in addition to OIEG—including (i) five subsidiaries of Exxon Mobil Corporation ("Exxon"), (ii) ConocoPhillips Company and three of its subsidiaries ("ConocoPhillips"), (iii) Gold Reserve Inc. ("Gold Reserve"), (iv) Crystallex International  Corporation ("Crystallex"), and (v) Rusoro Mining Limited ("Rusoro")—had separate pending arbitration proceedings against Venezuela and its alter ego, PDVSA, pursuant to which these creditors sought to recover billions in claims from Venezuela and/or PDVSA arising from expropriation of their assets.

44.     These proceedings resulted in the entry of numerous arbitral awards against Venezuela, including (i) on October 9, 2014, an arbitral award in favor of Exxon, in the principal amount of $1.6 billion (ii) on April 24, 2018, an arbitral award in favor of ConocoPhillips in the principal amount of just over $2 billion, (iii) on September 22, 2014, an arbitral award in favor of Gold Reserve in the principal amount of $713,032,000, (iv) on April 4, 2016, an arbitral award in favor of Crystallex in the principal amount of $1.2 billion, and (v) on August 22, 2016, an arbitral

award in favor of Rusoro in the principal amount of $966.5 million.  Just these few arbitral awards against Venezuela and/or PDVSA, when combined with the OIEG award, total approximately $7 billion excluding accrued interest.

45.     Many more billions of dollars in claims against Venezuela remained pending in ongoing arbitral proceedings or in other arbitral awards—excluding the arbitral awards in favor of OIEG, Gold Reserve, Crystallex, Exxon, ConocoPhillips, and Rusoro—Venezuelan government officials publicly stated that Venezuela would refuse to pay awards entered against it and would actively work to thwart efforts by creditors to enforce such awards.

46.     On numerous occasions, Venezuelan government officials stated that Venezuela's primary strategy to avoid enforcement of arbitral awards entered against the country would be to monetize Venezuela's assets in the United States—which Venezuela holds and controls through the Alter Ego Defendants—and transfer such assets outside of the United States.

47.     In a televised speech on January 8, 2012, then-President Hugo Chávez announced that Venezuela would refuse to pay arbitral awards against it, stressing that "we will not recognize any decision . . . .  They are trying the impossible: to get us to pay them.  We are not going to pay them anything."

48.     As Argus Media reported, in July 2014, Venezuelan officials recognized that a 2014 plan to sell CITGO assets was "motivated by concerns in Caracas that two arbitration panels at the World Bank's International Centre for Settlement of Investment Disputes (ICSID) likely will issue rulings soon ordering [PDVSA] to compensate ConocoPhillips and ExxonMobil for their stakes in Venezuelan integrated Orinoco assets that were nationalized in 2007."

49.     In August 2014, news outlets reported that "[t]he [Venezuelan] government says selling Citgo will protect oil assets from being seized by arbitration in international trials that are currently developing in America."

50.     While Venezuela did not sell CITGO assets, it effectuated an alternative strategy, alleged in detail below, to strip billions of dollars in value held from CITGO and transfer it beyond the reach of U.S. creditors.   Knowing that creditors would look to the assets held at CITGO Petroleum to satisfy their arbitral awards, Venezuela used its domination and control over the Alter Ego Defendants to drain the value of CITGO's U.S. assets and send that value to Venezuela.

## C.     VENEZUELA'S CONTROL OVER THE ALTER EGO ENTITIES

### i.     PDVSA Is an Alter Ego of Venezuela

51.     Venezuela controls and dominates PDVSA, which is the petroleum arm of the Venezuelan government.

52.     Venezuela's "Public Administration Organic Law" nominally recognizes PDVSA's own legal personality, but allows PDVSA's activities to be controlled by Venezuela's National Executive Branch through "control agencies or entities."   In its Decision No. 464 of March 18, 2002, Venezuela's Supreme Tribunal of Justice – Constitutional Chamber recognized that "although PDVSA is a company constituted and organized as a corporation," as set forth in the nation's constitution, nonetheless "there is no doubt" that PDVSA "falls within the framework of the general structure of the National Public Administration."   *See* Constitutional Chamber of the Supreme Tribunal of Justice, Decision No. 464 (Mar. 18, 2002).   In its Decision No. 281 of February 26, 2007, the same Court recognized that PDVSA enjoys the "privileges" of the Venezuelan state.   *See* Constitutional Chamber of the Supreme Tribunal of Justice, Decision No. 281 (Feb, 26, 2007).

53.     Venezuela exerts *de jure* control over PDVSA.  Article 1 of PDVSA's Articles of Incorporation provide that PDVSA is "a state company . . . created with the form of a commercial company, which shall comply with and execute the hydrocarbons policies dictated by the National Executive . . . in the activities entrusted to it."  PDVSA's Articles of Incorporation provide that the government, as the sole shareholder, represents Venezuela in PDVSA's Shareholder Assembly, which is responsible for the "supreme direction and management of the company."

54.     Venezuela also exercises *de facto* control over PDVSA.  PDVSA has admitted in SEC filings and debt offerings that "[t]he National Executive . . . regulates and supervises our operations."  The government appoints individuals to serve in the senior positions of PDVSA, and these appointees are often government officials themselves.  For example, Major General Manuel Quevedo has dual roles as Minister of Petroleum and President of PDVSA.  As Reuters reported, his appointment "giv[es] the already powerful military control of the OPEC nation's dominant industry."  General Quevedo is one of three current directors and/or officers of PDVSA who hold or previously held positions with Venezuelan Government Ministries and one of seven current directors and/or officers of PDVSA who held high-level positions in other state-owned entities.

55.     Between 2014 and 2017, Defendant Pino held these two positions while also serving as President of CITGO Holding and chairman of its board of directors.

56.     Venezuela dominates PDVSA's senior executive ranks.  PDVSA's former Vice President of Finance, Simon Alejandro Zerrpa Delgado ("Zerpa"), was also the president of Fondo Nacional para el Desarrollo Nacional ("FONDEN"), a Venezuelan government fund that distributes welfare benefits within Venezuela, to which PDVSA is obligated annually to transfer billions of dollars for purposes unrelated to the company's business.  To date, Zerpa remains on PDVSA's board as an external director.  PDVSA's subsequent Vice President of Finance, Iliana

Ruzza, was also the Vice-Minister of Finance in the Ministry of Economy, Finance and Public Banking of Venezuela.  PDVSA's current Vice President of Finance, Fernando Manuel de Quintal Rodriguez, previously served as the president of the state-owned entity Construpatria, S.A. and director of the state-owned entity Banco de la Vivienda.

57.     With General Quevedo acting as both President of PDVSA and Petroleum Minister of Venezuela, Venezuela has exercised even tighter control of PDVSA.  State Resolution No. 164, whose title translates to, "Regime to Review and Validate National and/or International Contracts Entered Into by PDVSA, its Affiliates and Mixed Companies Where PDVSA Holds Shares," requires that every national or international contract to which PDVSA is a party is subject to prior review and validation by General Quevedo, who serves simultaneously as the Minister of Petroleum.[1]   *See* Venezuelan Official Gazette 41.294, Resolution No. 164 (Dec. 6, 2017). Resolution No. 164 provides that "lack of prior review and validation by the Presidency of PDVSA of any contract will affect the existence and/or validity of any contract to be signed . . . ."  *Id.*  The same regulation applies to every contract entered into by a PDVSA affiliate, including, inter alia, PDVH, CITGO Holding, and CITGO Petroleum.

58.     Decree No. 44, issued by President Nicolas Maduro in April 2018, empowered the Minister of Petroleum to take a number of further controls over PDVSA, including, but not limited to, the following:

  a.     to create, eliminate, or make changes to state-owned oil companies, including PDVSA and its affiliates;

  b.     to create, eliminate, make changes to, or centralize the bodies that direct, administer, and manage state-owned oil companies;

  c.     to determine, eliminate, make changes to, or centralize the responsibilities, management or procedures in state-owned oil companies;

---

[1]     Venezuelan Official Gazette 41.294, Resolution No. 164 (Dec. 6, 2017).

d.   to establish general norms that all state-owned oil companies will follow;

e.   to create, eliminate, make changes to, or centralize procurement committees for state-owned oil companies;

f.   to establish procurement norms and procedures for the registration or suspension of clients and suppliers of state-owned oil companies; and

g.   to order the amendment of the by-laws of state-owned oil companies.

*See* Venezuelan Official Gazette 440.859, Decree No. 44 (Apr. 12, 2018).

59.   Decree No. 44 also provides that the directors and officers of state-owned oil companies "are obliged to carry out the actions required to effectuate the modifications that must be made pursuant to the provisions of this [decree] and pursuant to the instructions issued by the Petroleum Minister." *Id.*

60.   As foreign investors began seeking to enforce unpaid arbitral awards, Venezuela tightened its control over PDVSA.  An agreement establishing a U.S. litigation trust to assert claims of PDVSA arising from an alleged international bribery scheme further confirms Venezuela's domination and extensive control of PDVSA's assets and decision-making.  The PDVSA U.S. Litigation Trust Agreement dated July 27, 2017 (the "Trust Agreement") recites that it was entered into by PDVSA "acting in this matter through the Minister of the People's Petroleum Power (i.e., the Petroleum Minister) as a representative duly authorized to take action on behalf of PDVSA."  The Trust Agreement was executed on behalf of PDVSA by Nelson Martínez, Venezuela's then-Minister of Petroleum and former president of PDVSA and CITGO Petroleum. The trustee appointed by PDVSA, Alexis Arellano Bolívar, is the General Business Manager of the Petroleum Ministry.  The Trust Agreement provides that any decision to settle PDVSA's claims must be taken in "consultation with" Venezuela's Attorney General, and that any distribution of proceeds to PDVSA is then "subject to the approval" of the Attorney General.  Notices to PDVSA under the Trust Agreement must be delivered to a legal consultant within the Petroleum Ministry.

61.     Even before Venezuela tightened its control over PDVSA by appointing General Quevedo and passing Resolution No. 164 and Decree No. 44, Venezuela had controlled and manipulated PDVSA.

62.     Venezuela has directly fired employees of PDVSA, as well as arresting and imprisoning them.  In 2002, then-President Chavez fired seven PDVSA executives and forced twelve other employees to retire.  In 2003, he fired nearly 40% of PDVSA's work force.  During 2017–18, eighty PDVSA employees were arrested by Venezuela.

63.     Venezuela has exercised control over PDVSA's oil production levels and pricing. Through Resolution No. 195, the government dictated that PDVSA reduce crude oil production by 95,000 barrels per day.  *See* Venezuelan Official Gazette No. 433.107, Resolution No. 195 (Dec. 20, 2016).  PDVSA has had to disclose this limitation on its authority in its debt offerings, stating, in a September 2016 offering circular, that:

> The Venezuelan government, rather than the international market, determines the price of products such as gasoline, diesel, natural gas and natural gas liquids, or NGL, sold by us through our affiliates in the domestic market and, as a result, we earn substantially lower revenues on our products sold in Venezuela than on our exports and products sold internationally.  The continued existence of such price controls will continue to reduce our Venezuelan source revenues.[2]

64.     Venezuela has forced PDVSA to sell gasoline on the domestic Venezuelan market for as low as $.015 per liter, causing steep losses for PDVSA.

65.     PDVSA has publicly acknowledged Venezuela's control over its daily operations, disclosing to investors that:

a.      PDVSA could make no assurances "that the government of Venezuela will not require us to increase our financial contributions to social programs."

b.      PDVSA could make no assurances that Venezuela would not "impose further material commitments upon us or intervene in our commercial affairs in a

---

[2]     PDVSA Bond Offering Circular, filed with SEC on Sept. 19, 2016, at 26.

manner that will adversely affect our operations, cash flow and financial results."

c.      PDVSA could "offer no assurance that changes in Venezuelan law or the implementation of policies by the Venezuelan government will not affect our operations, cash flow and financial results."

d.      Venezuela, "as our sole owner, may cause us to pursue certain macroeconomic and social objectives that may adversely affect our results of operations and financial condition."

e.      PDVSA's "Business Plan is based on . . . key initiatives approved by the government of Venezuela."

f.      PDVSA is "controlled by the Venezuelan government, which ultimately determines our capital investment and other spending programs."

g.      The Venezuelan "government requires us to make significant financial contributions to social programs, including transfers to [FONDEN], as well as requiring us to fund specific projects."

h.      The Venezuelan "government may require that we increase our social contribution payments, or it may require us to divert a portion of our crude oil production to electricity companies in Venezuela, which would, in both cases, materially adversely affect our results of operations, cash flows and financial condition."

i.      "The Bolivarian Republic of Venezuela, as our sole owner, has pursued, and may pursue in the future, certain of its macroeconomic and social objectives through us.  As a result, we may engage in activities that give preference to the objectives of the Venezuelan government rather than our economic and business objectives. . . .  For instance, pursuant to the Venezuelan Constitution and the Organic Hydrocarbons Law, we are required to foster Venezuela's socio-economic development and the welfare of its citizens.  To that effect, the government requires us to make significant financial contributions to social programs, including transfers to FONDEN, as well as requiring us to fund specific projects."

66.     As noted by analysts at JPMorgan in a March 2015 report:

It is difficult to overemphasize the degree to which Venezuela as a sovereign credit and state-oil company PDVSA are intertwined. Venezuela relies on oil for some 97% of its overall exports, and PDVSA produces nearly 100% of all of Venezuela's oil exports. The government take from the oil sector traditionally accounts for about half of budget revenues, while in recent years it has also supported a large (and largely unaccountable) parallel budget. PDVSA's debt strategy has been integrally linked to the government's strategy for its [foreign exchange] regime.  And PDVSA

under Chavismo has declared itself "rojo-rojito" (redder than red), with an overtly pro-Chavez bent for supporting the government's social, economic and political agenda.

67.     PDVSA is, in effect, an adjunct to the Venezuelan treasury.  Venezuela treats PDVSA assets as its own.

68.     Industry analysts and academic observers have long noted that PDVSA's assets are, for all intents and purposes, Venezuela's.  The state routinely uses PDVSA's assets, without compensation, for state needs.  JPMorgan analysts reported in 2015 that "[t]he government in recent years has grown accustomed to taking out over $40 billion per year from PDVSA."

69.     Venezuela regularly uses PDVSA oil to satisfy Venezuela's foreign debt to the People's Republic of China by ordering PDVSA to sell millions of barrels of oil to China at below-market prices.  As a result, a large portion of PDVSA's oil exports do not generate cash flow for PDVSA, but rather are used to make amortized payments to the Chinese government on behalf of the Venezuelan state.

70.     Venezuela has used PDVSA assets to satisfy its obligations to Caribbean states.  Venezuela compels PDVSA to supply oil to seventeen Caribbean countries at heavily subsidized prices through Petrocaribe, a compact through which Venezuela provides member states with preferential payment arrangements for the purchase of petroleum and petroleum products.

71.     The International Monetary Fund has recognized that subsidies provided by PDVSA to the member states in Petrocaribe "have caused PDVSA's capital base to deteriorate and increase[d its] debt levels."

72.     In 2016, PDVSA "contributed" $659 million—over 41% of its annual profit—to FONDEN.  According to Reuters, the fund has been used by Venezuelan officials to meet government objectives without legislative approval.

73.     Upon information and belief, in or about November 2016, PDVSA issued its "Strategic Socialist Plan 2016 – 2025," which stated that PDVSA should be transformed into a "Socialist and Revolutionary PDVSA."  PDVSA's Strategic Objectives, as listed on its website, include "[s]upport[ing] the geopolitical positioning of Venezuela internationally."

74.     Venezuela has used PDVSA to pursue government policy ends unrelated to oil production, expending approximately $48 billion in PDVSA revenues to state projects including the construction of housing and promotion of agriculture.  PDVSA's involvement in these non-core enterprises is not the result of business decisions by PDVSA, but rather results from Venezuelan state mandates.

ii.     **PDVH and CITGO Holding are Alter Egos of Venezuela**

75.     Venezuela and PDVSA exercise extensive day-to-day control over PDVH and CITGO Holding, such that each corporation functions as a mere "pass through" entity that Venezuela and PDVSA use to control CITGO Petroleum.

76.     In a December 23, 2016 press release, PDVSA stated that CITGO Petroleum is under PDVSA's "full ownership and control," notwithstanding the fact that CITGO Petroleum is a subsidiary of CITGO Holding, which is a subsidiary of PDVH.

77.     Pursuant to Resolution No. 164, addressing the creation of a "Regime to Review and Validate National and/or International Contracts Entered Into by PDVSA, its Affiliates and Mixed Companies Where PDVSA Holds Shares," Venezuela granted the President of PDVSA— an office occupied by the Minister of Petroleum—legal authority to review and validate all contracts previously entered into by PDVH and CITGO Holding.  *See* Venezuelan Official Gazette 41.294, Resolution No. 164 (Dec. 6, 2017).  In the event any of these contracts was found

"lacking," Venezuela's designee at PDVSA was empowered to take "necessary corrective actions."

78.     Resolution No. 164 also empowers the President of PDVSA (and thus Venezuela) to establish new levels of administrative and financial authority within PDVH and CITGO Holding.  The resolution provides that the pre-existing "internal delegation" regime prevailing within those Delaware corporations is "without legal effect."  Through issuance of a resolution and without regard for corporate formalities, Venezuela unilaterally modified the corporate governance structure all of its subsidiaries, including of PDVH and CITGO Holding.

79.     Venezuela's promulgation of Decree No. 44 in April 2018 consolidated its extensive day-to-day control over PDVH and CITGO Holding, by granting the Petroleum Minister extraordinary powers to intervene directly in their management.  *See* Venezuelan Official Gazette 440.859, Decree No. 44 (Apr. 12, 2018).  As to each of PDVH and CITGO Holding, the decree empowers the Petroleum Minister to (1) create procurement committees, (2) establish procedures for the registration or suspension of clients and suppliers, and (3) amend the corporate bylaws.

80.     Most PDVH directors have had extensive ties to PDVSA and Venezuela and have held parallel positions in PDVSA management.  Defendants Chacin and Luongo, who at all relevant times served as directors of PDVH, simultaneously served as both officers and directors of PDVSA.  Defendant Castillo, who also served at all relevant times as director of PDVH, simultaneously served as President of PDVSA Gas, S.A. (a wholly-owned subsidiary of PDVSA) and as director of PDVSA.

81.     CITGO Holding's directors and officers have also had extensive ties to PDVSA and Venezuela and have held parallel positions in PDVSA management or with the Venezuelan government.  Defendant Pino, who at all relevant times served as CITGO Holding's President and

Chairman of its Board of Directors, simultaneously served as President of PDVSA *and* Venezuela's Minister of Petroleum.  Defendants Chacin and Luongo, who served as directors of CITGO Holding at all relevant times, also simultaneously served as both officers and directors of PDVSA and as directors of PDVH.

82.     Venezuela's control over CITGO Holdings is extreme, as it has used its powers of state to control the government-appointed directors of CITGO Holdings.  For example, President Maduro removed Defendant Pino from the board and, days later, government agents abducted Pino from his home and placed him in jail.

83.     PDVH has entered into multiple transactions that have provided no benefit to PDVH itself, but existed solely to funnel value upstream to PDVSA and Venezuela.  These transactions, which were part of a scheme to hinder, delay, or defraud creditors, illustrate the domination and extensive control that PDVSA and Venezuela have over PDVH, making PDVH an alter ego of PDVSA and Venezuela.

84.     Just as Venezuela and PDVSA dominate and control PDVH, so too have they dominated and controlled CITGO Holdings.  PDVSA has disclosed that CITGO Petroleum is under PDVSA's "full ownership and control," despite the fact that it is nominally owned by CITGO Holding.  Press Release, PDVSA, PDVSA Maintains Full Ownership of Citgo (Dec. 23, 2016).

85.     CITGO Holding has acknowledged that it is subject to PDVSA's domination and extensive control in its bond offering circulars, and specifically identified the control exercised by PDVSA and Venezuela as a significant risk factor that might adversely affect the value of its bonds for creditors.  A circular issued in connection with a 2015 bond offering warned, "[n]o assurance can be given that the Bolivarian Republic of Venezuela, as PDVSA's shareholder, will not adopt

policies or exercise its control of PDVSA in a manner that might adversely affect [CITGO Holding bondholders'] interests."  CITGO Holding went on to warn that "PDVSA could at any time in the future conduct other processes or undertake one or more transactions to monetize its interests in us, and any such process could be undertaken or any such transaction could occur at a time when it would be beneficial to PDVSA but could have a negative impact on [CITGO Holding's] business and operations."  These statements make no mention of PDVH, CITGO Holding's direct corporate parent, underscoring that entity's status as a "pass-through" structure used by PDVSA to carry out its activities within the United States.

86.     Venezuela's domination and extensive control of PDVH and CITGO Holding is evidenced by the events of 2015, alleged in greater detail below.

### iii.     CITGO Petroleum Is an Alter Ego of Venezuela

87.     Venezuela, through PDVSA, dominates and controls CITGO Petroleum.   In a December 23, 2016 press release, PDVSA confirmed its domination and extensive control of CITGO Petroleum: "Petróleos de Venezuela, S.A. (PDVSA) maintains full ownership and control over Citgo Petroleum Corporation, its subsidiary in the United States."

88.     Further, on February 2, 2019, President Maduro stated in a speech that "Citgo . . . belongs to the noble people of Venezuela."  This quote was further posted on President Maduro's Twitter page and retweeted on PDVSA's Twitter page.

89.     Members of CITGO Petroleum's executive team hold or previously held positions with Venezuelan Government Ministries and/or in other state-owned entities.  Indeed, the acting President and Chief Executive Officer of CITGO Petroleum, Asdrubal Chavez—who is the cousin of deceased former Venezuelan President Hugo Chavez—formerly served as Executive Director of Commerce and Supply of PDVSA, Vice President of Refining, Trade and Supply of PDVSA,

President of PDV Marina, and as Venezuela's Minister of the Popular Power of Petroleum and Mining and Vice Minister of Petrochemicals.  In addition, six other members of CITGO Petroleum's executive team also served on PDVSA's board of directors and served in other capacities for PDVSA, including Frank Gygax, Executive Vice President, who worked at PDVSA for 37 years in various capacities, including executive positions; Trina Martinez, Vice President and General Manager, who formerly worked at PDVSA; Alejandro Escarrá, Vice President of Legal Affairs, who was previously appointed to lead litigation in international claims for PDVSA and was also a legal assistant at Venezuela's Constitutional Chamber of the Supreme Court of Justice; Simón Suárez, Vice President, Supply & Marketing, who previously held several managerial positions at Intevep, the research branch of PDVSA, including as Supply Chain Manager and Manager International Trading for PDVSA; Eladio Perez, General Auditor, who previously held several positions at PDVSA; and Rafael Gómez, Vice President of Strategic Shareholder Relations, Government & Public Affairs, who worked at PDVSA for 23 years in various capacities, including executive positions.

90.     Previously, all members of CITGO Petroleum's executive team also served on PDVSA's board of directors and served in other capacities for PDVSA, including: Nelson Ferrer, Vice President for Exploration and Production; Guillermo Blanco, Vice President of Refining; and Ysmel Serrano, Vice President of Trade and Supply.  Further, three of the four previous members of CITGO Petroleum's board of directors served as both officers and directors at PDVSA: Sergio Antonio Tovar, Director of Planning; Defendant Luongo, Vice President of Refining, Trade and Supply; and Defendant Castillo as President.  The fourth board member, former CITGO Petroleum President and Chief Executive Officer Nelson Martinez, assumed his position at CITGO Petroleum in 2013 after a 33-year career at PDVSA.  On information and belief, others, including Eudomario

Carruyo and Dester Rodriguez, have served simultaneously as directors of PDVSA and CITGO Petroleum.

91.     Venezuela has directly fired employees of CITGO Petroleum, as well as arresting and imprisoning them.  In November 2017, six CITGO Petroleum executives were arrested in Caracas after Nelson Martinez, then president of PDVSA, instructed them to fly to Venezuela to discuss the company's budget.  The six executives included (1) Gustavo Cardenas, Vice President of Strategic Shareholder Relations, Government and Public Affairs; (2) Jorge Toledo, Vice President of Supply and Marketing; (3) Tomeu Vadell, Vice President of Refining; (4) Alirio Zambrano, Vice President and General Manager of Corpus Christi refinery; (5) Jose Luis Zambrano, Vice President of Shared Services; and (6) Jose Angel Pereira, the acting President

92.     Upon information and belief, PDVSA uses CITGO Petroleum in the United States as its procurement and accounts payable agent and to pay its own commercial debts.

93.     Upon information and belief, PDVSA uses CITGO Petroleum's assets in the United States for its own benefit without transferring any value to CITGO Petroleum.

94.     For example, when the government's commandeering of PDVSA assets left PDVSA unable to meet commercial obligations, they have simply been paid by CITGO Petroleum. On information and belief, PDVSA caused CITGO Petroleum to begin paying British Petroleum ("BP") for accounts payable incurred in relation to purchase light crude from BP.  On information and belief, bank transfer statements showed CITGO Petroleum paying more than $43 million to BP to satisfy PDVSA invoices, and internal PDVSA "communiques" acknowledged that "its cash-flow woes were causing logistics problems."  Upon information and belief, PDVSA personnel used these comminques to direct CITGO Petroleum personnel in the United States to pay PDVSA debts directly with CITGO Petroleum assets.  Reuters reports, "[t]o help with the import costs,

PDVSA turned to its unit in the United States, Citgo Petroleum, to pay two invoices to BP for a total of $43.7 million, according to bank transfer vouchers seen by Reuters."

95.     Upon information and belief, PDVSA has used CITGO Petroleum as a procurement and payment agent on many purchases and leases in the United States and elsewhere, including purchases and/or leases of aircraft, power generators, and mechanical components for vessels. Upon information and belief, PDVSA did not account for or compensate CITGO Petroleum for these purchases and/or leases because PDVSA regarded and deployed CITGO Petroleum's assets as its own.

96.     Upon information and belief, PDVSA has transferred its obligations under other purchase agreements to CITGO Petroleum in recent years, causing CITGO Petroleum to assume these obligations without consideration.

97.     On information and belief, in February 2016, PDVSA tapped into CITGO Petroleum's credit line in the United States to finance the import of light crude and refined products to Venezuela.  As reported in Argus Media, CITGO Petroleum's credit line was "one of several alternatives [PDVSA] is pursuing to get around suppliers' requirements for up-front cash payment."

98.     According to a May 25, 2017 report from Bloomberg, PDVSA and Venezuelan government officials are using CITGO Petroleum as part of a scheme to purchase crude oil from Syria for CITGO Petroleum's refinery in Aruba, which would then be re-sold into the United States in order to circumvent U.S. sanctions against Syria.  According to that report, the "previously undisclosed plan aimed to sell Syrian oil at a big discount to Venezuela through a Russian shell company, which would send it to Aruba for refining and distribution to gas stations in the U.S. and elsewhere, according to dozens of emails, documents and interviews."  That same report also stated

that communications exist "between Syrian and Venezuelan officials that included several executives of Houston-based Citgo Petroleum Corp., the U.S. subsidiary of PDVSA . . . ."

## D.   VENEZUELA'S SCHEME TO TRANSFER BILLIONS TO HINDER AND/OR DELAY CREDITOR COLLECTION EFFORTS AGAINST CITGO

### i.   The 2015 Dividends

99.     Recognizing that its U.S. subsidiaries were alter egos of the state, and thus that its U.S. assets were vulnerable to Venezuela's creditors, Venezuela devised schemes to siphon the value of those assets offshore.  One such attempt was an offer to sell CITGO Petroleum and remove proceeds to Venezuela.

100.    When Venezuela could not find a buyer, it devised an alternate scheme, using CITGO Holding to borrow billions of dollars, for no legitimate business purpose of CITGO Holding, and immediately transferring the loan proceeds through PDVH and PDVSA to Venezuela through a series of "dividends" (the "2015 Dividends").

101.    In two 2015 transactions, Venezuela and PDVSA, acting through PDVH, caused CITGO Holding to issue $1.5 billion in high-yield bonds, and to enter into a $1.3 billion loan facility.

102.    Upon closing, CITGO Holding immediately transferred the loan proceeds as an illegal dividend to PDVH.  PDVH immediately declared a dividend, and up-streamed the same proceeds to PDVSA.  This second dividend moved the funds out of the United States and beyond the reach of U.S. creditors, while making those funds available for use by Venezuela.

103.    The 2015 Dividends were controlled by Venezuela and carried out by PDVSA personnel and professionals hired by PDVSA.

104.    Upon information and belief, Venezuela, PDVSA, and the Alter Ego Defendants engaged in commerce in the United States.  PDVSA caused Deutsche Bank Securities, Inc.

("Deutsche Bank") to be retained in New York as its agent, and the agent of the Alter Ego Defendants, to effect this transaction. PDVSA had also retained Deutsche Bank to market other assets in the United States. Upon information and belief, PDVSA communicated its instructions relating to this transaction to Deutsche Bank through telephone calls and emails to the United States and in meetings in the United States.

105.   Upon information and belief, PDVSA caused the New York law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP to be retained to execute the 2015 Dividends. Upon information and belief, PDVSA communicated its instructions to the law firm through telephone calls and emails to the United States and in meetings in the United States.

106.   Upon information and belief, PDVSA's personnel participated in and directed, personally and through telephone calls, the negotiations in the United States relating to this transaction. PDVSA's personnel traveled to the United States to take part in meetings and negotiations relating to this transaction. Upon information and belief, Defendant Luongo met with CITGO Petroleum executives in the United States, including Nelson Martinez, and directed Mr. Martinez to provide information to Deutsche Bank for use in facilitating this transaction.

107.   Upon information and belief, Venezuelan state officials and PDVSA personnel communicated by telephone with CITGO Petroleum personnel and Deutsche Bank in the United States to direct CITGO Petroleum to structure and carry out the 2015 Dividends. Upon information and belief, General Rodolfo Marco Torres (a director of PDVSA and a Venezuelan government minister) often called Nelson Martinez (then- head of CITGO Petroleum) and Jose Pereira (CITGO Petroleum's then-vice president of finance) with instructions regarding this transaction. On information and belief, during one of these telephone calls, General Torres instructed Mr.

Martinez, who was in New York and shortly to meet advisors structuring the transaction, to have

CITGO Holding pledge its interest in CITGO Petroleum as collateral for this transaction.

108.    The result of this orchestrated scheme was that CITGO Holding was effectively

looted by incurring $2.8 billion in debt and encumbering its interest in CITGO Petroleum, with no

business purpose of CITGO Holding or its subsidiaries served thereby.  PDVH, with no interest of

it or its business served thereby, was left with its sole asset—its holding of CITGO Holding's

stock—devalued by the equivalent amount.

109.    CITGO Holding and PDVH were rendered insolvent and inadequately capitalized

by this transaction.  An offering circular issued by PDVSA on September 19, 2016 stated that

CITGO Holding had total shareholder's equity of $357.4 million as of December 31, 2015.  Upon

information and belief, however, that equity value was premised on an overstatement of the value

of CITGO Petroleum.  Once properly adjusted, CITGO Holding was insolvent prior to or was

rendered insolvent by the improper 2015 Dividends.

110.    CITGO Holding and PDVH were left with insufficient assets to satisfy their debts,

including but not limited to claims of OIEG and other similarly-situated creditors whose assets

had been expropriated by Venezuela in violation of international law and who, through principles

of alter ego, have claims against the transferors.

111.    CITGO Holding and PDVH received no reasonably equivalent value for the 2015

Dividends.

112.    Each of CITGO Holding and PDVH acted with actual intent to hinder, delay, or

defraud creditors by placing the moneys obtained by loans beyond the reach of creditors through

the 2015 Dividends.

113.     Approval and issuance of the $2.8 billion dividend payment by each of CITGO Holding (to PVDH), and PDVH (to PDVSA), was effected through acts of the board of directors of each corporation carried out in the United States, in each case under the domination, manipulation and control of Venezuela and PDVSA.

114.     The Director Defendants helped effectuate this improper scheme to hinder, delay or defraud Plaintiff by approving, through their positions as directors and officers of PDVH and CITGO Holding, the transactions constituting the 2015 Dividends.  Upon information and belief, the Individual Defendants were dominated, manipulated and controlled by Venezuela and PDVSA in approving an unlawful dividend of the loan proceeds for the improper purpose of hindering, delaying, or defrauding creditors like OIEG.

115.     The transactions that comprised the 2015 Dividends constituted commercial activity that took place, in significant part, in the United States.  Upon information and belief, the Alter Ego Defendants and the Individual Defendants took acts in furtherance of this transaction while in the United States, including, *inter alia*, from their corporate offices in Houston, Texas, and through their agents in New York, New York.

116.     All of the steps in this coordinated fraudulent transfer were part of a single, unified scheme, wherein the Alter Ego Defendants acted as mere instrumentalities of Venezuela.  The net result of these transactions was that the Alter Ego Defendants undertook $2.8 billion in secured debt solely for the purpose of moving U.S. assets out of the control of Delaware corporations, where they would be subject to attachment by creditors.

117.     The transactions comprising the 2015 Dividends were characterized by numerous badges of fraud, which reflect Defendants' fraudulent intent, including, but not limited to, the following:

a.     The transfers comprising the 2015 Dividends were transfers to statutory "insiders." CITGO Holding transferred $2.8 billion in debt proceeds as a "dividend" to PDVH, which controls CITGO Holding and is an "insider." PDVH subsequently transferred the $2.8 billion as a further "dividend" to PDVSA, which controls PDVH (and CITGO Holding) and is an "insider."

b.     Venezuela retained possession or control of the $2.8 billion transferred through the 2015 Dividends, as the final transfer to PDVSA, which is the alter ego of Venezuela, placed such funds within Venezuela's possession and control and rendered such funds immune from execution by creditors like OIEG.

c.     Before the transfers comprising the 2015 Dividends were made, Venezuela and its alter ego PDVSA had been sued or threatened with suit with the potential to result in billions of dollars in arbitral awards and judgments against it. Venezuela itself publicly recognized that the assets of its U.S. subsidiaries would be the primary targets for the enforcement of any unpaid arbitral awards.

d.     Through its alter ego PDVSA, Venezuela used the transfers comprising the 2015 Dividends to remove the monetized value of CITGO Holding, a domestic Delaware corporation that is the alter ego of Venezuela and PDVSA, outside the United States.

e.     Neither Venezuela, nor PDVSA, nor PDVH provided any consideration for the 2015 Dividends.

f.     Declaration of the 2015 Dividends was unlawful under Delaware law.

g.     In close proximity to carrying out the 2015 Dividends, Venezuela publicly expressed its intent to avoid liability for obligations arising from arbitral awards.

118.     In recognition of the fraudulent nature of the 2015 Dividends, on August 24, 2017, the President of the United States signed Executive Order No. 13808 (the "Executive Order"), which prohibited Venezuelan-owned companies, including CITGO Petroleum, CITGO Holding, and PDVH, from making dividend distributions to the Venezuelan government. The Executive Order defined "Government of Venezuela" to include "PdVSA, and any person owned or controlled by, or acting for or on behalf of, the Government of Venezuela."

ii.      **The 2016 PDVH Stock Pledges**

119.     Dominated and controlled by Venezuela and PDVSA, the Alter Ego Defendants continued to funnel value back to Venezuela and out of the reach of Venezuela's creditors.

120.     In October 2016, PDVSA executed an exchange in which holders of PDVSA bonds maturing in 2017 received exchange bonds at higher rates of interest, maturing in 2020.

121.     On November 30, 2016, PDVSA (for the ultimate benefit of Venezuela) obtained a $1.5 billion loan from Rosneft.

122.     To collateralize the exchange bonds, Venezuela and PDVSA caused PDVH to pledge 50.1% of PDVH's stock in CITGO Holding, which was effectuated through a pledge to MUFG, as indenture trustee for the benefit of the bondholders.  GLAS acted as collateral agent, for the benefit of the indenture trustee and the bondholders.

123.     To collateralize the Rosneft loan, Venezuela and PDVSA caused PDVH to pledge Rosneft, as secured party, the 49.9% equity interest in CITGO Holding that had not been pledged to the exchange bondholders.  (PDVH's pledges of all of its shares of CITGO Holding to secured PDVSA's obligations to the exchange bondholders and Rosneft are referred to as the "2016 Stock Pledges.")

124.     PDVH received no value, much less reasonably equivalent value, in return for the 2016 Stock Pledges.

125.     Upon information and belief, PDVH's board of directors approved the 2016 Stock Pledges through written consents and submitted their approvals to PDVH's offices in the United States or to PDVH's legal counsel in the United States.  PDVH and its board of directors were dominated, manipulated and controlled entirely by Venezuela and PDVSA in approving and entering into the transaction.

126.    The defendants recognized the fraudulent nature of the transaction at the time.  The offering circular for the 2016 Bond Exchange explicitly warned that "PDVSA cannot guarantee that a creditor of the Bolivarian Republic of Venezuela will not be able to interfere with the Exchange Offers, the Collateral or payments made under the New Notes, through an attachment of assets, injunction, temporary restraining order or otherwise."

127.    The 2016 Stock Pledges damaged PDVH's interests by putting CITGO Petroleum at risk of default.  A PDVSA default on the exchange bonds would allow bondholders, acting through the indenture trustee, to seize control of CITGO Holding.  Upon information and belief, this would trigger a 'change-of-control' clause in CITGO Petroleum's $5bn of debt, making it immediately payable."  This would damage its interests and the equity value held by CITGO Holding and PDVH.

128.    PDVH and its directors caused this improper transaction to occur only because they were dominated and utterly controlled by PDVSA and Venezuela.

129.    The 2016 Stock Pledges constituted, and took place together with commercial activity that took place, in significant part, in the United States.  PDVSA engaged The Depository Trust Company ("DTC"), a New York trust company, to serve as the Depository for the exchange bonds, and indicated in the accompanying offering circular that it would "apply to DTC for acceptance of the [bonds] in its book-entry settlement system."  PDVSA gave investors the option to "elect to hold interests in the [bonds] through [DTC]," or through two European banking services that separately engaged New York-based banks (Citibank N.A. and JPMorgan Chase Bank) to act as depositaries.  U.S.-based activity was integral to the execution of the 2016 Stock Pledges.

130.    Upon information and belief, the Alter Ego Defendants and the Individual Defendants took acts in furtherance of this transaction while in the United States, including, *inter alia*, from their corporate offices in Houston, Texas, and those of their agents in New York, New York.

131.    The 2016 Stock Pledges were part of a scheme orchestrated by Venezuela, PDVSA and PDVH with actual intent to delay, hinder, or defraud creditors like OIEG.

132.    The transactions comprising the 2016 Stock Pledges were characterized by numerous badges of fraud, which reflect Defendants' fraudulent intent, including, but not limited to, the following:

    a.    The transfers comprising the 2016 Stock Pledges were transfers made, without consideration, for the benefit of PDVSA, a statutory "insider."

    b.    Before the transfers comprising the 2015 Dividends were made, Venezuela and its alter ego PDVSA had been sued or threatened with suit with the potential to result in billions of dollars in arbitral awards and judgments against it. Venezuela itself publicly recognized that the assets of its U.S. subsidiaries would be the primary targets for the enforcement of any unpaid arbitral awards.

    c.    Through its alter ego PDVSA, Venezuela used the transfers comprising the 2016 Stock Pledges to convert value belonging to PDVH, a domestic Delaware corporation that is the alter ego of Venezuela and PDVSA, for the benefit of PDVSA.

    d.    Neither Venezuela nor PDVSA, provided any consideration for the 2016 Stock Pledges.

    e.    In close proximity to carrying out the 2016 Stock Pledges, Venezuela publicly expressed its intent to avoid liability for obligations arising from arbitral awards.

133.    The 2016 Stock Pledges were conceived and executed with the actual intent by PDVH, under the domination and control of Venezuela and PDVSA, to hinder, delay and defraud creditors of PDVH, including all those creditors of Venezuela that, under principles of alter ego, may assert their claims against PDVH.

134.    PDVSA stated that it had "used" its Delaware subsidiaries as its agents to accomplish the exchange bond and Rosneft transactions.  In a December 23, 2016 press release, PDVSA stated: "Just as PDVSA leveraged itself in October using as collateral 50.1% of Citgo for the Bond Exchange operation, in the midst of attacks against the company and a downturn in the global oil industry, it has used the remaining 49.9% [of equity in CITGO Holding] to raise new financing."  This press release also confirmed PDVSA's domination and control over PDVH and CITGO Holding, stating: "Petróleos de Venezuela, S.A. (PDVSA) maintains full ownership and control over Citgo Petroleum Corporation, its subsidiary in the United States."  No mention was made of PDVH or CITGO Holding, the two intermediary subsidiaries.

135.    The 2016 Stock Pledges, and the associated Rosneft loan and exchange bond transactions constituted commercial activity that took place, in significant part, in the United States.  Upon information and belief, the Alter Ego Defendants and the Individual Defendants took acts in furtherance of this transaction while in the United States, including, inter alia, from their corporate offices in Houston, Texas, and through their agents in New York, New York.

136.    Pursuant to the most recent sanctions imposed against Venezuela in the United States, the "Government of Venezuela" is defined to include the Bolivarian Republic of Venezuela, "PDVSA," and any entity that it directly or indirectly owns or controls.  Executive Order No. 13857, 84 FR 509 (2019).  The recent sanctions provide that all property and interests in property of Venezuela and PDVSA that are in the United States, that thereafter come within the United States, or that are or thereafter come within the possession or control of any United States person are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in, except as permitted pursuant to any general or specific licenses issued by OFAC.  Executive Order 13850, 83 FR 55243 (2018); *see also* 31 C.F.R. § 591.101 *et seq.*  Plaintiff will take appropriate steps to

ensure that all relief sought in this complaint complies with executive orders and other pertinent authority.

## COUNT I (DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201 – ALTER EGO)
### (Against PDVSA and Venezuela)

137.   Plaintiff re-alleges the allegations in paragraphs 1 through 136 of this Complaint as if fully set forth herein.

138.   An actual controversy exists between the parties as to which a declaration of the rights and legal rights of the parties is necessary and appropriate.

139.   Each of the Alter Ego Defendants is so extensively dominated, manipulated and controlled by Venezuela that each is Venezuela's mere instrumentality and alter ego, and the mere instrumentality and alter ego of the other Alter Ego Defendants.  In that capacity, each is directly liable for the obligations of Venezuela to OIEG.

140.   At all relevant times, Venezuela asserted extensive control over day-to-day and routine operations of each of the Alter Ego Defendants.

141.   At all relevant times, Venezuela used the property of each of the Alter Ego Defendants as its own.

142.   At all relevant times, Venezuela ignored the separate status and ordinary corporate formalities of each of the Alter Ego Defendants.

143.   At all relevant times, Venezuela deprived each of the Alter Ego Defendants of the independence from close political control that is generally enjoyed by government agencies.

144.   At all relevant times, Venezuela required each of the Alter Ego Defendants to obtain approvals for ordinary business decisions from the state.

145.   At all relevant times, Venezuela issued policies or directives that caused each of the Alter Ego Defendants to act directly on behalf of the State.

146.     Recognizing the corporate independence of any of the Alter Ego Defendants would result in fraud and injustice against Venezuela's creditors, including OIEG, as Venezuela has used each of the Alter Ego Defendants as its alter ego and mere instrumentality, and the alter ego and mere instrumentality of the other Alter Ego Defendants, all for the purpose of avoiding Venezuela's obligations to its creditors.

147.     OIEG is entitled to a declaration that PDVSA is directly liable to OIEG for all obligations of Venezuela to OIEG.

## COUNT II (DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201 – ALTER EGO)
### (Against PDVH and Venezuela)

148.     Plaintiff re-alleges the allegations in paragraphs 1 through 147 of this Complaint as if fully set forth herein.

149.     An actual controversy exists between the parties as to which a declaration of the rights and legal rights of the parties is necessary and appropriate.

150.     OIEG is entitled to a declaration that PDVH is directly liable to OIEG for all obligations of Venezuela to OIEG.

## COUNT III (DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201 – ALTER EGO)
### (Against CITGO Holding and Venezuela)

151.     Plaintiff re-alleges the allegations in paragraphs 1 through 150 of this Complaint as if fully set forth herein.

152.     An actual controversy exists between the parties as to which a declaration of the rights and legal rights of the parties is necessary and appropriate.

153.     OIEG is entitled to a declaration that CITGO Holding is directly liable to OIEG for all obligations of Venezuela to OIEG.

**COUNT IV (DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201 – ALTER EGO)**
**(Against CITGO Petroleum and Venezuela)**

154.     Plaintiff re-alleges the allegations in paragraphs 1 through 153 of this Complaint as if fully set forth herein.

155.     An actual controversy exists between the parties as to which a declaration of the rights and legal rights of the parties is necessary and appropriate.

156.     OIEG is entitled to a declaration that CITGO Petroleum is directly liable to OIEG for all obligations of Venezuela to OIEG.

**COUNT V (FRAUDULENT TRANSFER UNDER 8 DEL. CODE §§ 1304–05, 1307–08)**
**(Against CITGO Holding, PDVH and PDVSA)**

157.     Plaintiff re-alleges the allegations in paragraphs 1 through 156 of this Complaint as if fully set forth herein.

158.     In connection with the 2015 Dividends, CITGO Holding was a mere instrumentality and alter ego of Venezuela, and accordingly creditors of Venezuela are creditors of CITGO Holding within the meaning of the Delaware Uniform Fraudulent Transfer Act ("DUFTA") and other operative law.

159.     The Alter Ego Defendants and PDVSA effectuated the transfers comprising the 2015 Dividends with the actual intent to hinder, delay or defraud the creditors of Venezuela, including OIEG.

160.     CITGO Holding and PDVH were rendered insolvent and inadequately capitalized by the transfers made in the 2015 Dividends.

161.     CITGO Holding and PDVH did not receive reasonably equivalent value for the transfers made to PDVH, PDVSA and Venezuela in connection with the 2015 Dividends.

162.     Each of the 2015 Dividends should be avoided and unwound, such that OIEG should be granted declaratory relief against CITGO Holding, and a claim against each of PDVH

and PDVSA under this count, and the Court should enter such other and further relief as is warranted under DUFTA and operative law.

### COUNT VI (FRAUDULENT TRANSFER UNDER 8 DEL. CODE §§ 1304–05, 1307–08)
### (Against GLAS, MUFG, and Rosneft)

163.     Plaintiff re-alleges the allegations in paragraphs 1 through 162 of this Complaint as if fully set forth herein.

164.     In connection with the 2016 Stock Pledges, PDVH was a mere instrumentality and alter ego of Venezuela, and accordingly creditors of Venezuela are creditors of PDVH within the meaning of the DUFTA and other operative law.

165.     PDVH's grants of the 2016 Stock Pledges in favor of MUFG, Glas, and Rosneft constituted avoidable transfers under DUFTA.

166.     The 2016 Stock Pledges were granted by PDVH with the actual intent to hinder, delay, and defraud its creditors, including OIEG.

167.     The 2016 Stock Pledges should be unwound and canceled, and the Court should enter such other and further relief as is warranted under DUFTA.

### COUNT VII (DIRECT AND DERIVATIVE LIABILITY
### FOR ILLEGAL DIVIDENDS UNDER 8 DEL. CODE § 174)
### (CITGO Holding, PDVH, and the Director Defendants)

168.     Plaintiff re-alleges the allegations in paragraphs 1 through 167 of this Complaint as if fully set forth herein.

169.     Each of CITGO Holding and PDVH is an alter ego of Venezuela.  For purposes of 8 Del. Code § 174, OIEG was, at relevant times, and is today a creditor of CITGO Holding and PDVH.

170.     Under the administration of each of the Director Defendants, CITGO Holding and PDVH declared an improper dividend.  Each of the Director Defendants is jointly and severally

liable to his respective corporation, and to its creditors in light of the insolvency of the corporation, for the full amount of the dividend unlawfully paid, with interest.

171.    Each of the 2015 Dividends was in excess of the surplus of each of CITGO Holding and PDVH when made, and not paid from net profits for the fiscal year in which the dividend was declared and/or the preceding fiscal year.

172.    Each of the 2015 Dividends was unlawful.

173.    The Director Defendants acted in bad faith, willfully, or negligently in authorizing the 2015 Dividends.

174.    Each of CITGO Holding and PDVH was insolvent or rendered so by the 2015 Dividends.  Upon information and belief, each of CITGO Holding PDVH was left with insufficient assets to satisfy its debts, including but not limited to claims of Plaintiff and other similarly-situated creditors whose assets had been expropriated by Venezuela in violation of international law.

175.    It would be futile to request that CITGO Holding or PDVH prosecute claims against the Director Defendants because each corporation is a mere instrumentality of, and dominated and controlled by by Venezuela, for whose benefit the Director Defendants looted their respective companies.  CITGO Holding, PDVH, and the Director Defendants are jointly and severally liable to CITGO Holding, PDVH and their creditors for the full amount of the 2015 Dividends.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff OIEG requests that the Court enter judgment against Defendants as follows:

(a)    Declaring that PDVSA is an alter ego of Venezuela and is liable to OIEG for the total amount of the OIEG Award, and entering judgment against PDVSA in favor of OIEG for the total amount of the OIEG Award;

(b)      Declaring that PDVH is an alter ego of Venezuela and is liable to OIEG for the total amount of the OIEG Award, and entering judgment against PDVH in favor of OIEG for the total amount of the OIEG Award;

(c)      Declaring that CITGO Holding is an alter ego of Venezuela and is liable to OIEG for the total amount of the OIEG Award, and entering judgment against CITGO Holding in favor of OIEG for the total amount of the OIEG Award;

(d)      Declaring that CITGO Petroleum is an alter ego of Venezuela and is liable to OIEG for the total amount of the OIEG Award, and entering judgment against CITGO Petroleum in favor of OIEG for the total amount of the OIEG Award;

(e)      Declaring that the 2015 Dividends were fraudulent transfers and directing Venezuela, PDVSA, and PDVH to return the 2015 Dividends, plus prejudgment interest thereon, to CITGO Holding;

(f)      Awarding money damages against Venezuela, PDVSA, PDVH and CITGO Holding equal to the total amount of the OIEG Award, plus prejudgment interest;

(g)      Enjoining Defendants PDVH and CITGO Holding from removing assets outside of the United States;

(h)      Unwinding and voiding the 2016 Stock Pledges, and

(i)      Granting such other and further relief as the Court deems just and proper.

Dated: February 11, 2019                    MORGAN, LEWIS & BOCKIUS LLP


/s/ Jody C. Barillare
Jody C. Barillare (#5107)
The Nemours Building
1007 N. Orange Street, Suite 501
Wilmington, DE 19801
Telephone: 302-574-3000
Facsimile: 302-574-3001
jody.barillare@morganlewis.com

John C. Goodchild, III (*pro hac vice* forthcoming)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215-963-5000
Facsimile: 215-963-5001
john.goodchild@morganlewis.com

Sabin Willett (*pro hac vice* forthcoming)
Christopher L. Carter (*pro hac vice* forthcoming)
Arcangelo S. Cella (*pro hac vice* forthcoming)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston MA 02110
Telephone: 617-341-7700
Facsimile: 617-341-7701
sabin.willett@morganlewis.com
christopher.carter@morganlewis.com
arcangelo.cella@morganlewis.com

*Attorneys for Plaintiff, OI European Group B.V.*